1                IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF MISSISSIPPI
2                    NORTHERN DIVISION

3

BARBIE BASSETT                           PLAINTIFF
4

VS.                  CAUSE NO. 3:23-CV-03154-DPJ-ASH
5

GRAY MEDIA GROUP                    DEFENDANT
6

7

8

9

   ***********************************************************
10

11          ZOOM DEPOSITION OF MAGGIE WADE-DIXON

12

   ***********************************************************
13

14

15

16

          TAKEN AT THE INSTANCE OF THE PLAINTIFF
17        ON OCTOBER 3, 2024, BEGINNING AT 1:58 P.M.

18

19

20

21

22

23     GENA MATTISON GLENN, MS CSR 1568, TN LCR 884
               Glenn-Henry Reporting
24               Post Office Box 492
          Amory, Mississippi  38821-0492
25            gena.glenn@gmail.com
             (662) 315-2613

**EXHIBIT "D"**

1    <u>APPEARANCES:</u>

2    WAIDE & ASSOCIATES
          P.O. Box 1357
3         Tupelo, MS  38802-1357
          For the Plaintiff
4         BY:  RACHEL PIERCE WAIDE

5    SMOAK & STEWART
          International Place Tower II
6         6410 Poplar Avenue, Suite 300
          Memphis, TN  38119
7         For the Defendant
          BY:  M. KIMBERLY HODGES

8

9

     ALSO PRESENT:  KEITH MILLER
10                  BARBIE BASSETT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

     Reported by:  GENA MATTISON GLENN,
25                  MS CSR 1568, TN LCR 884
                    GLENN-HENRY REPORTING

1                           TABLE OF CONTENTS

2

WITNESS                                              PAGE

3

4    MAGGIE WADE-DIXON
     Examination by Ms. Rachel Pierce Wade              4

5

6

7    EXHIBIT
       NO.     DESCRIPTION                             PAGE

8

9                  (No Exhibits)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MAGGIE WADE-DIXON,

2     being first duly sworn, was examined and

3          testified under oath as follows:

4

5          MS. WAIDE:  Kim, just for the record

6     we're taking this deposition pursuant to

7     the Federal Rules of Civil Procedure, I

8     assume; and we can have the agreement that

9     we're reserving all objections except as to

13:58:48  10     the form.

11          MS. HODGES:  Yes.  Correct.

12

13                    EXAMINATION

14     BY MS. WAIDE:

15          Q.   Ms. -- I was going to call you

16     Ms. Wade.  Do you prefer Ms. Wade-Dixon or

17     Ms. Wade?

18          A.   I answer to either.  It's --

19          Q.   Okay.  Good.

13:58:58  20          A.   -- (indiscernible).

21          Q.   Well, you know, I'm Ms. Waide as well,

22     obviously; but we spell it a different way.  But

23     I always feel like that's my husband's mother,

24     right?  It's Ms. Waide.  Right?  So I'm just --

25          A.   Either way.  Either way.

1        Q.   I'm just Rachel for you, and we

2   appreciate so much your being here today.   I

3   told you before we went on the record that I

4   represent Ms. Bassett.   My husband and I

5   practice law together up in Tupelo.   And so we

6   represent her in this claim that she has filed.

7            Have you ever given a deposition

8   before?

9        A.   No.

13:59:29  10        Q.   That's not a bad thing.   It's probably

11   a positive thing for your life.

12            I'll give you just a couple of ground

13   rules, and those are:   We have a court reporter,

14   Ms. Glenn, who is in Amory, Mississippi, I

15   think; and she is typing everything that you say

16   and everything that I say.   That means that we

17   need you to answer out loud, because I'm looking

18   at you, so when you nod your head yes to me, I

19   know what that means.   But she needs to type it

13:59:55  20   down so that when we look back at this, a year

21   later or two years later, we'll know exactly

22   what you meant, so if you'll answer out loud.

23            Also, this is something that I'm very

24   guilty of doing.   We have to be careful not to

25   talk over one another.   It's so natural in

1    conversation.  We're -- we're talking to each

2    other, we're interacting, and then we start to

3    speak over one another.  And she can't type two

4    voices at once.  So you'll have to remind me

5    about that, and I'll do the same about you.

6         A.   Thank you.

7         Q.   Also this is not some sort of

8    endurance test.  If you need a break at any

9    time, something's going on, there's a big story

14:00:29  10    at the station, you know, you need to step out,

11    you just need to run to the restroom, you tell

12    me and we're happy to take a break.  Again, not

13    an endurance test.

14              So with that out of the way, do you

15    have any questions before we get started?  Are

16    you comfortable where you are, ready to get

17    going?

18         A.   Yes.  Ready to go.

19         Q.   Okay.  Well, we appreciate, again,

14:00:47  20    your being here.

21              This is sort of an odd question, but I

22    have to ask it of everyone because I had it come

23    up once.  Are you taking any medication today --

24    not any medication but any medication that might

25    impair your ability to understand my questions

1    or impair your ability to answer truthfully.

2            A.   No.

3            Q.   Okay.  This is another -- I'm getting

4    all the bad questions out of the way early,

5    Ms. Wade, or Ms. Wade-Dixon.  Because this case

6    involves age and race, I have to ask:  What is

7    your age?

8            A.   My age is 63.

9            Q.   Okay.  And what is your race?

14:01:21  10            A.   African-American.

11            Q.   Where are you from?

12            A.   Crystal Springs, Mississippi.

13            Q.   You are from where my friend Justice

14    Jim Kitchens is from.

15            A.   Yes.  Yes.

16            Q.   You know (indiscernible)?

17            A.   I've known him all my life.

18            Q.   Yes.  Well, me too -- well, almost my

19    whole life.  Probably about 25 years, so not my

14:01:40  20    whole life.  But I always say I'm 27, so, you

21    know, kind of --

22            A.   He's a dear family friend.

23            Q.   Yes.  Same with us.  I'm glad you two

24    know each other.  And where do you live now?

25            A.   Brandon, Mississippi.

1    Q.  And can you tell us just a little bit

2    about your educational background?  You don't

3    have to go all the way back to elementary

4    school, but maybe where you finished high school

5    and then college.

6    A.  I finished high school at Utica High

7    School, and then I went to Jackson State

8    University.  Transferred my sophomore year to

9    Mississippi College, and my degree is from

14:02:12  10   Mississippi College in business administration.

11   Q.  Did you do any additional training

12   after your time at MC?

13   A.  No.

14   Q.  I'm sorry?

15   A.  No.

16   Q.  Did I step -- are you married?

17   A.  Yes.

18   Q.  And to whom are you married?

19   A.  Nathaniel Andre Dixon.

14:02:32  20   Q.  Have you ever been married before?

21   A.  No.

22   Q.  Do you have any children?

23   A.  Yes.

24   Q.  Are those children over the age of 21?

25   A.  Yes.

1          Q.   And where do they live?

2          A.   My son lives in Chicago and my

3     daughter in Jackson, Mississippi.

4          Q.   And what's your daughter's name who's

5     in Jackson?

6          A.   Kimberly Ward.

7          Q.   Tell us just a little bit about your

8     employment background.  Obviously you're here

9     today because you're working at the television

14:03:00  10   station, right?  How did you get from MC into

11    the television world?

12         A.   Well, actually, all of my -- I worked

13    in work-study jobs.  All of my work-study jobs

14    at Mississippi College dealt with

15    communications, and I was hired here my senior

16    year.

17         Q.   So straight out of college?

18         A.   Yeah.  Well, before I graduated.  I

19    was a senior, and I've been here since then.

14:03:28  20    Q.   Ever worked at any other television

21    stations?

22         A.   No.  This is the only one.

23         Q.   Okay.  I know that you have been in

24    various spots anchoring or coanchoring various

25    shows.  What is your position now at the

1   station?

2         A.   I am an anchor for 5:00 and 10:00 and

3   news reporter.

4         Q.   Okay.  At the time that Ms. Bassett

5   was at the station, do you remember what your

6   job was then?

7         A.   Yes.

8         Q.   What schedule you were working?

9         A.   Yes.  5:00 and 10:00.

14:04:00  10         Q.   Okay.  Still --

11         A.   Yeah.

12         Q.   -- the 5:00 and 10:00?

13         A.   Uh-huh.

14         Q.   Okay.  Have you ever been involved in

15   any prior litigation?  You told us you've not

16   given a deposition, but have you ever been

17   involved in a lawsuit?

18         A.   No.

19         Q.   Do you know of any other station

14:04:17  20   employees who have been involved in litigation

21   with the station?  And let me expand on that a

22   little bit.  Maybe they have sued the station

23   because they allege they were wrongfully

24   terminated.  Maybe they had a dispute over a

25   noncompete agreement.  Maybe they had a wreck in

1   the station news car, right?

2          Do you know of any station employees

3   during your tenure there -- and I realize that's

4   a long tenure -- who have been involved in

5   litigation with the station?

6      A.  No.

7          MS. HODGES:  Object to form.

8   BY MS. WAIDE:

9      Q.  Okay.  That's a no?  I'm sorry.  You

14:04:51  10   can go ahead and answer.

11      A.  No.

12      Q.  Thank you.

13          Have you ever been a witness in a

14   case?  Have you ever had to go to court and be a

15   witness?

16      A.  No.

17      Q.  I want to --

18      A.  Not that I --

19      Q.  Okay.  I want to talk a little bit

14:05:08  20   about your employment at the station.  Have you

21   ever had -- I know you haven't had any lawsuits

22   with the station.  Have you ever had reprimands

23   or discipline from the station?

24      A.  No.

25      Q.  Have you had any issues over your

1     contract with the station?

2          A.   No.

3          Q.   Do you know of other anchors who might

4     have had disciplinary actions -- I'm calling it

5     a disciplinary action or a reprimand.  I'm not

6     certain what you call it.  Sometimes in the

7     employment we call it a write-up or a

8     counseling.  Do you know of other anchors who

9     have had that?

14:05:48  10          MS. HODGES:  Object to form.  You can

11               answer, Ms. Wade.

12          A.   No.

13     BY MS. WAIDE:

14          Q.   Okay.  I'd like to turn a little bit

15     to Ms. Bassett and how you know her.  How did

16     you get to know her?

17          A.   I met her when she first came to work

18     here.  She came to do weather, and -- and then

19     we actually worked the same shift when she was

14:06:12  20     chief meteorologist for the 10:00 o'clock

21     newscast; and then we worked together on the

22     4:00 and 4:30 newscast for several years along

23     with Stephanie Bell Flynt.

24          Q.   So how long would you say you've known

25     her?  Can you give me an estimate on the number

1    of years?

2         A.   Estimate, over 20 years, maybe.

3         Q.   A long time.

4         A.   Yes.

5         Q.   How would you describe your

6    relationship with her?

7         A.   I've always had great love for her and

8    consider her a friend.

9         Q.   Can you describe for us her work?  How

14:06:48  10   was her work at the station?

11        A.   Hard worker.  Dedicated.  Loved what

12   she did.  Always loved what she did.

13        Q.   Did you two have a friendship outside

14   of work or were you strictly co-workers?

15        A.   We did have a friendship outside of

16   work, yes.

17        Q.   Have you maintained that friendship

18   with her or not since her termination?

19        A.   Yes.  We're still friends.

14:07:18  20   Q.   Did you have the opportunity, as part

21   of your work at the station, to see Ms.

22   Bassett's interaction with other people who

23   worked at the station?

24        A.   When we worked the same shift, yes.

25        Q.   Were those people of different ages

1    and different races that worked at the station?

2         A.   Yes.

3         Q.   Can you describe for us what her

4    relationship was like with the other people who

5    worked at the station?

6              MS. HODGES:   Object to form.  You can

7         answer.

8         A.   Very friendly.

9    BY MS. WAIDE:

14:07:50  10    Q.   Did you know of her having any bad

11   relationships with the people with whom she

12   worked at the station?

13        A.   No.

14        Q.   Did you ever have any opportunity to

15   observe Ms. Bassett's interactions with viewers?

16   In other words, did viewers ever come for

17   interviews, maybe -- maybe people came in for an

18   interview on the show, or maybe they came for a

19   station tour?  Did you ever have any opportunity

14:08:15  20   to observe that?

21        A.   Yes.

22        Q.   What did you observe about

23   Ms. Bassett's interaction with viewers?

24        A.   Friendly, warm, loving, and grateful.

25        Q.   I want to take you forward to October

1    of 2022 and see if you remember.  We're calling

2    this sort of the "grandmammy" comment.  I don't

3    know if you remember.  I think Ms. Bassett was

4    on air with Carmen Poe, and they were talking

5    about football, and she made a comment that

6    included the word "grandmammy."  Were you aware

7    of that?

8         A.   I was not -- are -- I don't understand

9    exactly --

10        Q.   Let me ask a better question.

11        A.   Yes.

12        Q.   Were you at the station or able to

13   witness that comment live, in person?

14        A.   No.

15        Q.   Did you hear about it at some later

16   time?

17        A.   Yes.

18        Q.   Tell me how you heard about it.

19        A.   Barbie called me.

20        Q.   Can you tell us about that

21   conversation?

22        A.   Yes.  She was very remorseful, very

23   sad, confused, because she said, you know -- she

24   explained to me, which I already knew, she

25   didn't mean it in malice or in a negative -- any

GLENN-HENRY REPORTING (662) 315-2613

1    negative way.  And I think she was shocked at

2    the reception of how people reacted to her using

3    that word.

4         Q.   Did she tell you why she chose that

5    word to describe a grandmother?

6         A.   Yes.  She said that it was a word that

7    she heard growing up from some of the women who

8    worked with her mom and worked in her home, and

9    that that is what they called their

14:10:00  10    grandmothers, and so she was not aware that it

11    was a term that many saw as offensive.

12         Q.   What did you tell her about that?

13         A.   I told her that it was -- when I was

14    growing up if you used that word, it was an

15    automatic fight because it was seen as something

16    negative and demeaning, and it was not a word

17    that I used or -- and even if other

18    African-Americans said it to you, that it was an

19    automatic fight because it was a demeaning term.

14:10:34  20         Q.   Right.  And how did she respond to

21    that?

22         A.   She didn't know.  She said, I really

23    didn't know.

24         Q.   Did you know whether or not the

25    station disciplined her in any way for that

1    comment?

2        A.   I saw her apology.  She told me that

3    she was going to apologize.

4        Q.   Did you know if she wrote that apology

5    or how that apology got on air?

6        A.   I don't know.  I assume she wrote it.

7        Q.   Did you weigh in in any way on the

8    content of that apology?

9        A.   No.

14:11:06  10    Q.   She didn't run it by you or ask you

11    what you thought, anything like that?

12        A.   No.

13        Q.   Did the station ask your opinion --

14    you are an African-American female.  Did anyone

15    associated with the station ask you your opinion

16    of the comment?

17        A.   Yes.

18        Q.   Who asked you that?

19        A.   Our general manager.

14:11:28  20    Q.   And who was that?

21        A.   Ted Fortenberry.

22        Q.   What did Ted ask you?

23        A.   He just asked me if I was okay.  He

24    was concerned about me, and he asked me how I

25    was feeling.  And he was obviously very

1    concerned about the other employees as well, in

2    addition to Barbie.

3         Q.   Right.  And he was concerned about

4    Barbie, you said?

5         A.   Yes.  Yes.

6         Q.   Okay.  Let's talk first about the

7    other employees.  Which other employees was

8    Mr. Fortenberry concerned about?

9         A.   All of us.  The entire station.

14:12:03 10         Q.   What do you think brought on his

11   concern?

12        A.   The number of emails and phone calls

13   that we received after the comment.

14        Q.   Were you personally receiving those

15   emails, or were they coming to the station in

16   general?

17        A.   Both.

18        Q.   Were you turning over those emails to

19   someone at the station or just responding to

14:12:25 20   them yourself?

21        A.   I didn't respond to any of them, and I

22   didn't turn them over, no.

23        Q.   Did you know whether or not anyone

24   else at the station responded to those emails?

25        A.   No.

1     Q.  And I asked you a very bad question.

2    Do you know whether -- did anyone tell you, for

3    example, I'm -- look, I'm going to respond to

4    these emails; this is the response that we're

5    sending out?

6     A.  No.

7     Q.  Okay.  Did the station or anyone

8    associated with the station ask you to gather

9    those emails?

14:12:57  10     A.  No.

11     Q.  Did you have a discussion with Carmen

12    Poe about this comment?

13     A.  No.

14     Q.  Did you have a discussion with any

15    other station employees about the comment?

16     A.  Yes.

17     Q.  With whom did you discuss the comment?

18     A.  It was general in the newsroom.  As

19    you can imagine, most of us were concerned.

14:13:24  20     Q.  And tell me why you were concerned.

21     A.  I was concerned about Barbie because I

22    felt like, you know, she did not mean it with

23    malice.  But I was also concerned because there

24    were others who were offended.  And again, we

25    were being bombarded with phone calls and emails

1   with people who were concerned about the

2   statement.

3       Q.  I want to back up to when you told me

4   Mr. Fortenberry was concerned about all of you

5   but he was also concerned about Barbie.

6       A.  Yes.

7       Q.  Did he express anything to you about

8   his concern about Ms. Bassett?

9       A.  He just wanted to make sure everyone

14:14:08 10  was okay.  He knew she was having a hard time,

11  as he knew that most of us were.

12      Q.  Did Mr. Fortenberry or anyone

13  associated with the station ever say anything to

14  you such as, Ms. Bassett should be terminated

15  over this?

16      A.  No.

17      Q.  Did you think anyone else associated

18  with the station believed she should be

19  terminated over it?

14:14:31 20          MS. HODGES:  Object to the form.

21      A.  No.

22  BY MS. WAIDE:

23      Q.  You may answer.  I'm sorry.

24  Occasionally she'll --

25          MS. HODGES:  She did --

BY MS. WAIDE:

    Q.  -- object to the form.

        MS. HODGES:  I'm sorry.  She --

        MS. WAIDE:  I couldn't hear it at all.

I'm sorry.

        MS. HODGES:  Yeah.  She did.

        And just while we're taking a minute,

I'll just remind you, Ms. Wade:  You can

answer if I -- when I object unless I'm

specifically telling you not to.

        So go ahead.  Sorry, Rachel.  She did

answer it, but I'll let her answer again.

BY MS. WAIDE:

    Q.  I'm sorry.  Could you answer that

again for me?  I couldn't hear it.

    A.  No.

    Q.  No.  Okay.  Thank you.

        After this comment, after Ms. Bassett

issued her on-air apology, how was she treated

at the station?

    A.  We worked different shifts, so I don't

know.

    Q.  Since you weren't there with her, did

anyone on your shift or anyone you had contact

with tell you how they were treating

1    Ms. Bassett?

2         A.   No.

3         Q.   Did Ms. Bassett herself tell you if

4    she -- tell you whether or not she was being

5    treated any differently?

6         A.   Yes.

7         Q.   What did she tell you about that?

8         A.   She mentioned that Carmen told her she

9    was not offended, and I think several others on

14:15:58  10  that shift mentioned that they were not offended

11   and, I think, expressed their concern for her.

12        Q.   Is that Carmen Poe you're talking

13   about --

14        A.   Yes.

15        Q.   -- just for the sake of the record?

16        A.   Yes.

17        Q.   And Carmen Poe, again, for the sake of

18   the record, was the reporter with whom

19   Ms. Bassett was having the conversation, right?

14:16:16  20       A.   Yes.

21        Q.   And I think I cleared this up, but I

22   want to be sure.  At no point did you ever

23   discuss the "grandmammy" comment with Carmen

24   Poe; is that correct?

25        A.   No, I did not.

GLENN-HENRY REPORTING (662) 315-2613

1          Q.   Did you believe that there should have

2     been some sort of discipline or serious

3     repercussions for the "grandmammy" comment?

4          A.   No.

5          Q.   I want to take you forward, then,

6     after that comment, to March 8 of 2023.  And

7     that's the date I'll represent to you that there

8     was a comment on air by Ms. Bassett repeating

9     something that Snoop Dogg had said, is the "fo

14:17:03  10     shizzle my nizzle" comment.  And I'll ask you

11     sort of the same questions that I asked you

12     about the "grandmammy" comment.

13          Were you present for that comment?

14          A.   No.

15          Q.   You-all were still working different

16     shifts, right?

17          A.   Yes.

18          Q.   Okay.  Did you know that the comment

19     was made?

14:17:19  20          A.   After Barbie told me.  I think Barbie

21     called me.

22          Q.   Tell us about that conversation.

23          A.   Again, she was devastated.  She was

24     crying.  I think we did more praying and talking

25     about God than we actually did the comment.  And

1    I told her I didn't know what it meant.  I don't

2    listen to rap, but --

3         Q.   We will not tell Snoop that.  We will

4    not.  Right?

5         A.   But I Googled the word and I explained

6    to her, you know, why that word would be

7    offensive.

8         Q.   But you were unfamiliar with the

9    phrase; is that fair?

14:17:56  10         A.   Yes.

11         Q.   Did you believe Ms. Bassett was

12    familiar or unfamiliar with the phrase?

13         A.   I would say familiar.  I thought she

14    was familiar with it.

15         Q.   Let me ask a different question.  Did

16    you think she was familiar or unfamiliar with

17    whatever the meaning of the phrase is?

18         A.   No.

19         Q.   Okay.  What was the station's reaction

14:18:18  20    to her use of that phrase?

21         A.   Shock.

22         Q.   With whom did you discuss it?  How did

23    you know people were shocked?

24         A.   Just general conversation in the

25    newsroom.  More people knew what it meant than I

1    did.

2          Q.   Can you remember any particular person

3    with whom you had a discussion about

4    Ms. Bassett's use of that?

5          A.   It was general.  No.

6          Q.   It was general.  Okay.  That's fair.

7               Did anyone with the station come to

8    you and ask you, What do you think about her use

9    of the comment?

14:19:02  10          A.   Yes.

11          Q.   And what -- who did that?

12          A.   Another colleague.

13          Q.   Who was that?

14          A.   Oh, gosh.  I can't recall.  It was --

15    I can't recall because I was at my desk and

16    someone just walked up and asked me.

17          Q.   But you don't remember who that person

18    was?

19          A.   No, I don't.  Sorry.

14:19:25  20          Q.   Is it someone who's with the station

21    now?

22          A.   I don't think so.  If I recall, it may

23    have been one of our trainees or interns or

24    someone like that.

25          Q.   Got it.

1          Did you continue to talk with

2     Ms. Bassett in the days between her making the

3     comment and her ultimate termination from the

4     station, which I'll submit to you was March 14,

5     I think, 2023?

6          A.    Not often, but yes.

7          Q.    And what sorts of conversations did

8     you have with her?

9          A.    Encouraging her.  Reminding her that

14:20:03  10     God was in control and that God is able and that

11     I was praying for her and concerned about her

12     and her family, and again, that I did not

13     believe that she meant it with any malice, I did

14     not believe that she was a racist, and that I

15     was her friend and I loved her and I would

16     continue to pray for her.

17          Q.    Do you still feel that way today?

18          A.    Yes.

19          Q.    Did you believe that Ms. Bassett

14:20:28  20     should have been terminated?

21          A.    Yes.

22          Q.    You did believe she should have been

23     terminated.

24          A.    Yes.

25          Q.    Because of -- well, let me ask you a

1    better way.  Why did you think she should have

2    been terminated?

3        A.   I think it would have been difficult

4    for her and the station because of how people

5    responded and because of how it -- our job is

6    all about credibility and trust.  And because so

7    many people had lost that -- that trust, and

8    trust is essential in this business, I think it

9    would have been hard for her and hard for us.

14:21:26  10        And honestly, I think -- I don't think

11   she wanted -- she would have wanted to stay if

12   it meant hardship for other people.  That's the

13   kind of heart she has.

14        Q.   Did she ever express to you that she

15   didn't want to stay or you just assumed that?

16        A.   I assumed it.

17        Q.   Did you talk with Ms. Bassett strictly

18   by telephone during these days, or did you

19   exchange any text messages?

14:21:53  20        A.   Some text messages and by phone.

21        Q.   Okay.  Did you see any changes at the

22   television station in terms of ad sales after

23   this comment, after the "fo shizzle my nizzle"

24   comment, or would you have known about that?

25        A.   I would not have known about that.

1          Q.   That would be something for the

2     advertising department, I assume?

3          A.   Yes.  Sales, yes.

4          Q.   Sales.  Okay.

5               How did you learn that Ms. Bassett was

6     terminated?

7          A.   She told me.

8          Q.   What did she tell you?

9          A.   She told me that they let her go.  She

14:22:27  10   seemed pretty devastated; but I told her that,

11    you know, it is what it is, and God has

12    something bigger and better for her.

13         Q.   You said she was devastated.  Describe

14    for us, if you will:  What was her demeanor?

15    What was she like when she was telling you?

16         A.   Lots of crying.  She could barely

17    talk, and so I just tried to encourage her.

18         Q.   Did you continue to check in on

19    Ms. Bassett in the days after her termination?

14:22:58  20   A.   Yes, I did.  It was not often but --

21    you know, when I think about it.  You know, I'd

22    say, How are you doing?  And she would check on

23    me as well.

24         Q.   Did she continue to be upset, or do

25    you know whether she continued to be upset about

1    her termination?

2         A.   We didn't talk about it as much after

3    the initial -- we didn't talk about that, and I

4    think that was -- it was purposeful on my part

5    and I think on her part as well.

6         Q.   Right.

7         A.   I really didn't want to talk about

8    that.  It was -- it was hurtful and it was

9    painful, and I think it was for everybody here.

14:23:42  10    So I -- you know, I tried to stay positive and

11    keep positive for her.

12         Q.   So it was hurtful.  You said it was

13    hurtful, it was painful.  Her termination or her

14    making the statement?

15         A.   The whole situation.  All of it.

16         Q.   Let's move to talking about

17    Ms. Bassett's replacement.  Who took her spot?

18    Do you know who that is?

19         A.   Samantha German anchors in that spot

14:24:07  20    now.

21         Q.   Samantha German.  For the record, what

22    is Ms. German's race?

23         A.   African-American.

24         Q.   And do you know her age?

25         A.   No.

1          Q.  Could you give me your best guess?

2              MS. HODGES:  Object to the form.

3          A.  I have no idea.

4      BY MS. WAIDE:

5          Q.  Is she younger than you or older than

6      you?

7          A.  I'm older than most people here.

8          Q.  Okay.  Well, you've been there since

9      college, so you're not that old, right?  It's

14:24:36  10   just that you started early.  You started early.

11          A.  But yeah, I -- I'm older than most

12      people here, so I would definitely say I'm older

13      than she is.

14          Q.  Fair enough.  Do you know about

15      Ms. German's qualifications, where she came

16      from?

17          A.  No.

18          Q.  Do you work directly with her?

19          A.  No.

14:24:54  20       Q.  So you're still on that schedule where

21      you're on an opposite shift from her the way you

22      were with Ms. Bassett when Ms. Bassett was

23      leaving.

24          A.  Yes.

25          Q.  Is that fair?  All right.

1           Let's talk about other recent hires at

2     the television station.  Ms. Bassett left in

3     March of 2023.  That's when she was terminated.

4     Do you know who else has been hired since she

5     left other than Ms. German?

6           A.   A lot of people.

7           Q.   Tell me the ones you remember.

8     Specifically -- let me ask it this way:

9     Specifically on air, either -- you know, the

14:25:34 10   talent, right?  On-air anchors or on-air

11    reporters.

12          A.   Well, several meteorologists have been

13    hired.  Let me see.  Several reporters.  And

14    that's about it.

15          Q.   Do you know the names of the

16    meteorologists who have been hired?

17          A.   Gosh.  Ashley Sivik.

18          Q.   Okay.

19          A.   Chase, and I can't remember -- because

14:26:10 20   they all -- they don't work my shift, so I don't

21    know, like, his last name.  Oh, gosh.  Let's

22    see.  Todd Adams.  And there's one other, and I

23    can't think of her name.  And I see her face.  I

24    can't believe I can't think of her name.  But

25    she -- they all worked the morning shift.

1      Q.   What about the reporters who've been

2    hired?

3      A.   We've had several.  Let me see.  We

4    have Teddy Reidy, Verlecia Gavin, Morgan Harris,

5    Nathan Lee, and we have one who recently left

6    who was in news.

7      Q.   And who's the one who left?

8      A.   Oh, gosh.  His name just went right of

9    my head.  I'm sorry.  It's (indiscernible) --

14:27:14  10      Q.   It's okay.  It's not a memory test.

11      A.   -- with names.  Yes.  But he -- he

12    recently left.

13      Q.   And he's a male?

14      A.   Yes.

15      Q.   And was he an anchor or he was just an

16    on-camera reporter?

17      A.   Reporter.  On-camera reporter.

18      Q.   Let's talk a little bit about the

19    market for your station.  Do you know what the

14:27:35  20    viewing area is?

21      A.   Yes.  Our viewing area -- we call it

22    DMA.  And it consists of the largest counties in

23    central Mississippi.  We also reach some areas

24    of Arkansas and Louisiana.

25      Q.   Okay.  Do you have any idea about the

demographics of the viewers in that viewing

area, like, their ages or their races, that sort

of thing?

          A.   I know some.  I know that we have a

large African-American population, but in some

of the outer counties, not as much.  So I think

probably the largest urban and African-American

area would definitely be Hinds County.

          Q.   Is the station itself located in Hinds

County?

          A.   Yes.

          Q.   Do you have any idea about the general

age of your viewership?

          A.   It varies.  I think we have young

viewers, but most of them tend to get their news

from social media rather than newscasts.  But I

would say probably our viewers -- and we

actually do surveys -- from 18 up to elderly.

          Q.   So it kind of runs the gamut?

          A.   It does.

          Q.   Let's talk about the anchors who are

there right now.  Do you know how many anchors

the station employs?

          A.   Well --

          Q.   Maybe you have to count up the shows,

1   right?

2          A.   I can start with morning, on mornings.

3          Q.   Okay.  Tell me who those anchors are.

4          A.   Wilson Stribling and Samantha German.

5   And then we have Ashley Garner, who does the

6   noon and the weekends; and then she also anchors

7   at 4:00 and 4:30.  And then, of course, there's

8   me and CJ LeMaster.  Then Howard and Courtney

9   Ann Jackson.  And Patrice Clark anchors the Fox

14:29:52  10  newscast at 5:30 and at 9:00 and 9:30.  Then on

11  weekends we have Morgan Harris, and Holly Emery

12  does the early mornings on the weekends.

13         Q.   I'd like to talk about each of those

14  anchors if we can.  Let's start with Wilson and

15  Samantha.  They're in the morning.

16         A.   Yeah.

17         Q.   Wilson is a male; is that correct?

18         A.   Right.

19         Q.   And what is his race and age?

14:30:18  20         A.   He is white.  I have no idea how old

21  he is.

22         Q.   Okay.  And Samantha, a female.  Do you

23  know her race and age?

24         A.   African-American.  No.

25         Q.   No on the age.  What about Ashley

1    Garner at noon?

2          A.    Ashley is African-American.

3          Q.    Any idea about her age?

4          A.    No.

5          Q.    And then obviously we know you're a

6    female and African-American, right?

7          A.    Right.

8          Q.    CJ LeMaster got stolen from us up in

9    North Mississippi, so I know that he is a

14:30:52  10    Caucasian male, right?

11          A.    Yes.

12          Q.    He did a great job up here.  Y'all are

13    lucky to have him.

14                What about Howard and Courtney Ann?

15          A.    Courtney is a white female.  I don't

16    know how old she is.

17          Q.    What about --

18          A.    Howard is a black male.

19          Q.    And then what about Patrice Clark?

14:31:11  20          A.    African-American female.

21          Q.    Any idea about her age?

22          A.    No.

23          Q.    And Morgan Harris?

24          A.    African-American female.

25          Q.    Any idea about her age?

1          A.   No.

2          Q.   And Holly Emery, I think is the last

3     person you mentioned.

4          A.   Yes.  She's a white female.

5          Q.   And her age?

6          A.   I don't know.

7          Q.   We'll be able to tell all these people

8     you did not get their age right -- I mean wrong,

9     right?

10          A.   Yeah.

11          Q.   Didn't get it.

12          A.   I don't know their --

13          Q.   We appreciate that.

14          A.   -- their ages.

15          Q.   Are there any other anchors currently?

16     Any other anchors?

17          A.   No, not that -- no.  I'm thinking, but

18     no.  Those are the shows that we have, yes.

19          Q.   How many on-camera reporters do you

20     have, if you know?

21          A.   Holly does a lot of the reporting on

22     mornings.  And then we have Verlecia, Morgan,

23     Teddy Reidy, Nathan Lee, Chris Fields, Quentin

24     Smith.

25               Oh, and I forgot about the sports

1     anchors.  Patrick Johnstone is a white male, and

2     Kasie Thomas is an African-American female.

3         Q.   Okay.

4         A.   And I don't know their ages.  But --

5     and I think that's it in terms of reporters.

6         Q.   Can you back up, if you would, and

7     tell me the ages, if you know, and the races of

8     those reporters that you identified other than

9     the sports anchors which you just identified for

14:32:47 10     me?

11         A.   Okay.  I don't know how old Holly is.

12     She's a white female.  Teddy Reidy is a white

13     male.  I don't know how old he is.  Morgan

14     Harris is a black female.  Don't know her age.

15     Verlecia Gavin is a black female.  Chris Fields

16     is a black male.  Quentin Smith is a black male.

17     I'm trying to go through.

18         And we have a new hire.  I just forgot

19     about her.  Claire.  Claire is a white female.

14:33:22 20         Q.   Are you ever involved in the hiring or

21     firing decisions at the station?

22         A.   No.

23         Q.   Are you ever involved in the decisions

24     about -- you say that with a smile, right?  You

25     don't want to be involved in that.

1      A.   (Indiscernible.)

2      Q.   Are you ever involved at the station

3  in decisions about discipline or reprimands?

4      A.   No.

5      Q.   I want to talk a little bit about

6  disciplines and reprimands.  You know, you're

7  live on air a lot, right?  And have you ever

8  said anything on air that you thought was

9  inappropriate, somehow incorrect, maybe that you

14:34:01  10  needed to apologize for?

11      MS. HODGES:  Object to form.  You can

12         answer if you know.

13      A.   No.  Other than mispronouncing a name,

14  that's it.

15  BY MS. WAIDE:

16      Q.   Nothing that the station has ever come

17  to you and said, You should retract that, or we

18  don't feel good about the fact that you said

19  that?

14:34:23  20      A.   No.

21      Q.   What about your coworkers?  What about

22  other anchors there?  Have you ever heard them

23  say things that you think were somehow

24  inappropriate, incorrect?

25      A.   No.

1    Q.   Have you ever said anything that you

2    just thought, Wow, I wish I had not said that on

3    air?

4    A.   No.

5    Q.   What about your co-workers?  Have you

6    ever thought that they said something that you

7    thought, Wow, that was not a great thing to say

8    on air?

9    A.   No.

14:34:57  10    Q.   Other than the two comments that we've

11    talked about today, the "grandmammy" comment and

12    the "fo shizzle my nizzle" comment, have you

13    ever known Ms. Bassett to say anything on air

14    that you thought was inappropriate?

15    A.   No.

16    Q.   Do you know anything about the

17    station's policies about discipline in terms of

18    if some -- if an employee does make an

19    inappropriate comment on air, whether that

14:35:19  20    results in termination or discipline?

21    A.   No.

22    Q.   Do you know whether the station has

23    what I would call a progressive discipline

24    policy, meaning, you know -- sort of like a

25    series of strikes is the best way I know to

describe it?  Maybe this is a first warning,

this is a second warning?

    A.   Yes.

    Q.   Okay.  Tell me about that.

    A.   All I know is that, you know, usually

if there's a problem, you're called in.  If the

problem is repeated, then you're written up.

And -- and I -- I'm not sure what happens after

that.

    Q.   How do you know about that policy?

    A.   Just from general knowledge, and I

think -- just from general knowledge.

    Q.   When you say "general knowledge," do

you mean you read it in a handbook or someone

told you about it?

    A.   I think someone mentioned it.

    Q.   Do you know who the person is who

mentioned it to you?

    A.   I don't.  I can't -- it's been years

ago.

    Q.   And you're not -- you're not getting

in trouble, right?  So that's fair.  You're not

getting these disciplines.

    A.   No.

    Q.   Do you know of other people who are?

1    A. No.

2    Q. Have you known anyone to be

3 disciplined since you've been there?  And I mean

4 that you have known about personally.

5    A. Yes.

6    Q. Tell me who that was.

7    A. I can't remember who it was.  It was

8 something out in the field that happened, and

9 basically they were talked to, and they shared

14:37:03 10 that with me.  I can't remember if it was a

11 photographer or the actual reporter.

12    Q. Okay.  Can you remember what happened

13 out in the field?

14    A. I think it was a missed opportunity,

15 not in place when they were supposed to be,

16 something like that.

17    Q. Okay.  It was not a live comment; is

18 that --

19    A. No.  No.  No.

14:37:23 20    Q. What was the public reaction, if you

21 know, when Ms. Bassett was terminated?

22    A. I think there were lots of people who

23 were happy, but there were also lots of people

24 who were not happy.  There were many who were

25 torn.  And I think they were like me:  They

1       hated to see it happen, but they tried to

2       understand.  And that's where I was.  I hated to

3       see it happen, but I understood.

4               And that's what I got from -- when I

5       -- because I do speaking engagements, and that's

6       what I got from -- I got people who either

7       thought it was wrong, thought it was right, or

8       they hated to see it happen and they understood.

9           Q.  Was there a racial division in those

14:38:20  10    people who either thought it was wrong or

11      thought it was right?

12          A.  I heard -- I heard it from both,

13      African-Americans as well as whites --

14          Q.  They --

15          A.  -- that fell into those categories.

16          Q.  So is it fair to say there were some

17      African-Americans and some whites who thought

18      she should have been fired?

19          A.  Yes.

14:38:36  20    Q.  And there were some African-Americans

21      and some whites who thought the station should

22      have retained her.

23          A.  Yes.

24          Q.  Do you know who made the decision to

25      terminate her at the station?

```
 1              A.   No.

 2              Q.   Do you know in general at the station

 3    who makes termination decisions?

 4              A.   In general, it depends on the

 5    department.

 6              Q.   In general who makes termination

 7    decisions as to anchors on air, talent?

 8              A.   That would be our news director and

 9    our general manager.

10              Q.   Who was the news director at time

11    Ms. Bassett was terminated?

12              A.   Charlie Jones.

13              Q.   And who was the general manager at the

14    time?

15              A.   Ted Fortenberry.

16              Q.   Did either Mr. Jones or

17    Mr. Fortenberry ask you whether or not you

18    believed Ms. Bassett should be terminated?

19              A.   No.

20              Q.   Did anyone associated with the station

21    ask you that?

22              A.   No.

23              Q.   Do you know if any of your colleagues

24    were asked whether or not she should be

25    terminated?
```

14:39:13 (line 10)
14:39:33 (line 20)

1          A.   No.

2              MS. WAIDE:  I have no further

3     questions, Kim.

4              MS. HODGES:  I don't think I have any.

5     Keith, do we need to take a break or are we

6     good?

7              You're on mute, but I'm assuming you

8     just said no.  Okay.

9              All right.  No questions.  Thank you.

10             (Deposition concluded at 2:39 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2   STATE OF MISSISSIPPI )

3   COUNTY OF MONROE    )

4   RE: ORAL DEPOSITION OF MAGGIE WADE-DIXON

5        I, Gena Mattison Glenn, CSR 1568, a

6   Notary Public within and for the aforesaid

7   county and state, duly commissioned and acting,

8   hereby certify that the foregoing proceedings

9   were taken before me at the time and place set

10   forth above; that the statements were written by

11   me in machine shorthand; that the statements

12   were thereafter transcribed by me, or under my

13   direct supervision, by means of computer-aided

14   transcription, constituting a true and correct

15   transcription of the proceedings; and that the

16   witness was by me duly sworn to testify to the

17   truth and nothing but the truth in this cause.

18        I further certify that I am not a

19   relative or employee of any of the parties, or

20   of counsel, nor am I financially or otherwise

21   interested in the outcome of this action.

22        Witness my hand and seal on this 18th day

23   of October, 2024.

24                      _____

    My Commission Expires:   MS CSR 1568

25   July 19, 2027         Notary Public

                            TN License No. 884

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


BARBIE BASSETT                           PLAINTIFF

VS.             CAUSE NO. 3:23-CV-03154-DPJ-ASH

GRAY MEDIA GROUP                         DEFENDANT




                    CERTIFICATE
        I, Maggie Wade-Dixon, have read the
foregoing pages, 1-45, of the transcript of my
deposition given on October 3, 2024, and it is
true, correct and complete to the best of my
knowledge, recollection and belief except for
the list of corrections, if any, attached on a
separate sheet herewith.  Witness my hand, this
the _____ day of _____, 2024.


                         _____
                         Maggie Wade-Dixon



                    CERTIFICATE

        Subscribed and sworn to before me, this

the _____ day of _____, 2024.



_____
Notary Public in and for the
County of _____
State of Mississippi
My Commission Expires:  _____

GLENN-HENRY REPORTING
P.O. BOX 492
AMORY, MISSISSIPPI 38821-0492

CORRECTION LIST
Barbie Bassett vs. Gray Media Group
No. 3:23-CV-03154-DPJ-ASH

CAPTION

October 3, 2024                  Maggie Wade-Dixon

DATE OF DEPOSITION             DEPONENT'S NAME


PAGE   LINE    CORRECTION                REASON

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

=================================================

                              _____
                              Maggie Wade-Dixon

1                  GLENN-HENRY REPORTING
                     P.O. BOX 492

2               AMORY, MS 38821-0492

3

    October 18, 2024

4

    Honorable M. Kimberly Hodges

5   SMOAK & STEWART
    International Place Tower II

6   6410 Poplar Avenue, Suite 300
    Memphis, TN  38119

7

    RE:  Barbie Bassett vs. Gray Media Group

8   No. 3:23-CV-03154-DPJ-ASH

9   Dear Ms. Hodges:

10  Enclosed is your copy of the transcript of the
    deposition of Maggie Wade-Dixon, taken in the

11  above entitled and numbered cause on October 3,
    2024.

12

    Also enclosed is the signature page and

13  corrections page to be used by the deponent when
    reading your copy of the deposition.

14

    After the signature page and corrections page

15  have been completed by the deponent, and
    properly signed by a Notary, please return these

16  forms to Ms. Rachel Pierce Waide so that they
    may be attached to the original transcript.

17

    If the completed signature page and corrections

18  sheet have not been received by Ms. Rachel
    Pierce Waide on or before November 23, 2024, (30

19  days), reading and signing will be waived.

20  Thank you for your cooperation.

21  Sincerely,

22

23  Gena Mattison Glenn
    CSR 1568

24  Enclosures
    cc:  Ms. Rachel Pierce Waide

25