UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

BARBIE BASSETT                                                                  PLAINTIFF

V.                                                      CIVIL ACTION NO. 3:23-CV-3154-DPJ-ASH

GRAY MEDIA GROUP, INC.,
d/b/a WLBT-TV                                                                    DEFENDANT

ORDER

Local television-news anchor Barbie Bassett lost her job after making two on-air remarks

in a six-month period that her employer, Gray Media Group, Inc., found racially offensive.

Bassett sued, alleging racial discrimination and other wrongs.  Gray Media—which does

business as the WLBT television station in Jackson, Mississippi—now moves for summary

judgment [35].

Bassett says she never intended to offend anyone, which the Court can accept as true.

But the "employment laws do not transform federal courts into human resources managers, so

the inquiry is not whether [WLBT] made a wise or even correct decision . . . .  Instead, '[t]he

ultimate determination, in every case, is whether, viewing all of the evidence in a light most

favorable to the plaintiff, a reasonable factfinder could infer discrimination.'"  *Owens v.

Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (quoting *Crawford v. Formosa

Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)) (other citations omitted).  Bassett has not

met that legal standard; the Court grants the motion.

I.      Background

Bassett appeared on the air in various capacities from 1999 until her termination from

employment in 2023.  Bassett CV [39-1].  Her trouble began in October 2022 during a show she

co-anchored, *Today at 11*.  Bassett Dep. [39-2] at 46–47.  During some on-air "banter" with a

Black reporter, Bassett—a White woman—"suggested to [the reporter] what she should do was to ask her grand mammy . . . to bake a chocolate or pecan pie" for some visiting ESPN journalists. *Id*. at 47.

This "grand mammy" remark generated complaints and led WLBT to give Bassett a written warning that the comments were "insensitive and inappropriate" and that "[a]ny other performance or behavior that is deemed unacceptable will lead to termination of employment." Notice [35-1] at 177. Bassett insisted she meant nothing wrong by the term—which she said she used when referring to her own grandmother—but she offered an on-air apology. Bassett Dep. [39-2] at 56–58.

After a second remark in March 2023, WLBT let Bassett go. While discussing Snoop Dogg, Bassett repeated one of the celebrity's catchphrases, "fo' shizzle, my nizzle." *Id*. at 76–77. Although WLBT's management was initially unsure whether the term was offensive, its news director, Charles Jones, and its general manager, Ted Fortenberry, later concluded that the phrase included a variant of the "N-word." *Id*. at 78; *see* Fortenberry Dep. [39-8] at 28, 33; Jones Dep. [39-6] at 42–44, 47. Bassett thought the phrase just meant "for real, my friend" or "for real, my brother." Bassett Dep. [39-2] at 78. But there is no dispute that the comment generated a second round of complaints from Black co-workers and viewers.

WLBT met with Bassett and offered her the choice of resignation (with a waiver and severance payments) or termination. *Id*. at 90–91. Bassett chose termination, which took effect that same month. *Id*. at 92. The station later replaced Bassett with a Black journalist, supposedly after a White employee declined the job. Jones Dep. [39-6] at 69–70. The station also enforced the one-year noncompetition clause in Bassett's contract. Agr. [39-3] at 6; Fortenberry Dep. [39-8] at 38.

Bassett filed a timely EEOC charge, alleging race and age discrimination, and received a right-to-sue letter. After that, she sued. WLBT moved for summary judgment, and the Court heard oral argument on May 1, 2025.[1]

## II.    Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[ ] and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[ ] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v.*

---

[1] That same day, the Court conducted a pretrial conference to expedite a trial setting if the case survived summary judgment.

*Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated

assertions, and legalistic arguments have never constituted an adequate substitute for specific

facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754,

759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

The party opposing summary judgment must identify specific evidence in the record and

to articulate the precise manner in which that evidence supports his claim.  *See Forsyth v. Barr,*

19 F.3d 1527, 1537 (5th Cir.), *cert. denied,* 513 U.S. 871 (1994).  "Rule 56 does not impose

upon the district court a duty to sift through the record in search of evidence to support a party's

opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n.7

(5th Cir.), *cert. denied,* 506 U.S. 832 (1992).  And disputed fact issues that are "irrelevant and

unnecessary" to deciding the motion will not be considered by the Court.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.    Discussion

Bassett has conceded her age-discrimination claim.  Pl.'s Mem. [43] at 1.  So that leaves

her Title VII race-discrimination claim and her claim to declare her noncompetition agreement

void because WLBT fired her without cause.  Compl. [1] ¶¶ 11, 15.

A.    Race Discrimination

The parties dispute the test that should apply.  WLBT lays out the classic *McDonnell

Douglas* framework used when a plaintiff relies on circumstantial evidence to prove

discrimination.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see*

Def.'s Mem. [37] at 7–8. Bassett says there are other ways to prove a Title VII claim. The first question is whether Bassett presents a circumstantial or direct-evidence case.

       1.     Direct Evidence

"Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). It must be "direct and unambiguous." *Read v. BT Alex Brown Inc.*, 72 F. App'x 112, 119 (5th Cir. 2003) (quoting *E.E.O.C. v. Tex. Instr'ts Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)). For instance, the Fifth Circuit found direct evidence in *Jones v. Robinson Property Group, L.P.*, because the decisionmaker regularly used a racist epithet and said, "[T]hese good old white boys don't want black people touching their cards." 427 F.3d 987, 993 (5th Cir. 2005). "Direct evidence of an employer's discriminatory intent is rare; therefore, Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence." *Scales v. Slater*, 181 F.3d 703, 709 (5th Cir. 1999) (footnote omitted).

Bassett never claims that her case offers direct evidence of discrimination, but she relies on a quote from WLBT's 30(b)(6) deposition stating that there are "some things that black people can say that white people can't." R. 30(b)(6) Dep. [35-4] at 16. There's more to the quote, as discussed later, but Bassett argues that "[a] reasonable fact finder could *infer* from Defendant's 30(b)(6) deposition alone, that a black person, using the exact same language that Bassett used, with no racist intent, would not have been fired." Pl.'s Mem. [34] at 14 (emphasis added). An inference is not enough to constitute direct evidence. *Sandstad*, 309 F.3d at 897. In any event, Bassett offers no direct-evidence argument, so the Court will apply the circumstantial-evidence analysis.

2.     Is *McDonnell Douglas* Good Law?

In *McDonnell Douglas*, the Supreme Court established a burden-shifting analysis that the Fifth Circuit has routinely applied in circumstantial cases under Title VII.  *See, e.g.*, *Russell*, 235 F.3d at 222.  Bassett argues that this analysis no longer applies, but she fails to support her position with applicable law.

First, during oral argument, Bassett urged the Court to adopt *Brady v. Office of the Sergeant at Arms*, a D.C. Circuit opinion stating "that inquiry into the prima facie case is usually misplaced."  520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.).  The Fifth Circuit has expressly rejected *Brady* as "foreclosed by our precedent."  *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607 (5th Cir. 2007); *see also Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 641, 649 (5th Cir. 2025).

Second, Bassett maintains that *McDonnell Douglas* is no longer viable considering cases like *Reeves*.  530 U.S. at 143.  That's wrong, at least for now.  True enough, some Supreme Court justices have signaled their displeasure with *McDonnell Douglas*.  For example, in *Hittle v. City of Stockton*, Justice Thomas (joined by Justice Gorsuch) dissented from the denial of certiorari, believing the Court should revisit *McDonnell Douglas*.  145 S. Ct. 759 (2025).  But the Supreme Court has yet to unravel the *McDonnell Douglas* burden-shifting analysis.

Thus, the Fifth Circuit has repeatedly held that this analysis "must" be followed in circumstantial cases under Title VII.  *Etienne v. Spanish Lake Truck & Casino Plaza, LLC*, 778 F.3d 473, 475 (5th Cir. 2015) (holding that "[i]f the plaintiff presents only circumstantial evidence, then she must prove discrimination inferentially using the three-step *McDonnell Douglas*" burden-shifting framework) (citation omitted); *accord Hassen v. Ruston La. Hosp. Co., L.L.C.*, 932 F.3d 353, 356 (5th Cir. 2019), *as revised* (Aug. 1, 2019).

3.    Burden-Shifting Analysis

Bassett says hers is a "mixed motive" case.  Pl.'s Mem. at 15–16.  The Fifth Circuit

applies a modified *McDonnell Douglas* approach in those cases:

> the plaintiff must still demonstrate a prima facie case of discrimination; the
> defendant then must articulate a legitimate, non-discriminatory reason for its
> decision to terminate the plaintiff; and, if the defendant meets its burden of
> production, "the plaintiff must then offer sufficient evidence to create a genuine
> issue of material fact 'either (1) that the defendant's reason is not true, but is
> instead a pretext for discrimination (pretext alternative); or (2) that the
> defendant's reason, while true, is only one of the reasons for its conduct, and
> another "motivating factor" is the plaintiff's protected characteristic (mixed-
> motive alternative).'"

*Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (quoting *Rishel v. Nationwide*

*Mut. Ins. Co.*, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003)).

a.    Prima Facie Case

A Title VII plaintiff must begin by showing the elements of prima facie discrimination.

In most cases, that requires proof:

> that she (1) belongs to a protected group; (2) was qualified for the position at
> issue; (3) was discharged or suffered some adverse employment action by the
> employer; and (4) was replaced by someone outside her protected group or was
> treated less favorably than other similarly situated employees outside her
> protected group.

*Shahrashoob*, 125 F.4th at 649 (citing *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir.

2021)).  WLBT concedes the first three elements but says Bassett's case fails at the fourth

element.  Def.'s Mem. [37] at 8–9; Def.'s Reply [44] at 2.[2]

---

[2] During oral argument, the Court questioned whether the above-quoted version of the fourth
element applies in a work-rule-violation context.  In such cases, the Fifth Circuit has held that "a
Title VII plaintiff may establish a prima facie case by showing 'either (1) that he did not violate
the rule, or (2) that, if he did, white employees who engaged in similar acts were not punished
similarly.'"  *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 892–93 (5th Cir. 2012) (quoting
*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)).  Bassett's claim likely
fails under the work-rule-violation test, but WLBT argued that the test is not exclusive.  Given

Bassett offers no comparators, so her prima facie case depends on proof that WLBT replaced her with someone outside her protected class. WLBT says she can't make that showing because it first offered the position to a White employee who declined. Def.'s Reply [44] at 2. But WLBT cites no binding authority suggesting that the initial offer means Bassett was not "replaced by someone outside her protected group." *Shahrashoob*, 125 F.4th at 649. The Court will assume Bassett can make a prima facie case.

b.      WLBT's Nondiscriminatory Reason

At this stage, WLBT must "proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Blow v. City of San Antonio*, 236 F.3d 293, 297 (5th Cir. 2001). "This burden on the employer is only one of production, not persuasion, involving no credibility assessments." *Russell*, 235 F.3d at 222.

According to WLBT, it "discharged Plaintiff because she used racially offensive language on-air—twice." Def.'s Mem. [37] at 6 (citing Fortenberry Dep. [39-6] at 32–33; Jones Dep. [39-8] at 51–52). Bassett argued during the hearing that this reason is not race-neutral because a Black reporter would not have been disciplined for saying the same thing. As discussed in the next section, that argument is not supported. Regardless, there is no dispute Bassett's comments generated complaints, and, at this stage, WLBT faces a burden of production, not persuasion. *Russell*, 235 F.3d at 222. Indeed, "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason." *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1002 n.8 (5th Cir. 2022). WLBT met its burden of production.

---

that concession, the Court will focus on the test WLBT advanced—whether Bassett was treated differently or was replaced by a Black journalist.

c.    The Ultimate Burden

Assuming this is a mixed-motive case as Bassett suggests, a modified test applies at this

final stage of the burden-shifting analysis.  *Rachid*, 376 F.3d at 312.  Under this test,

> the plaintiff must . . . offer sufficient evidence to create a genuine issue of
> material fact either (1) that the defendant's reason is not true, but is instead a
> pretext for discrimination (pretext alternative); or (2) that the defendant's reason,
> while true, is only one of the reasons for its conduct, and another "motivating
> factor" is the plaintiff's protected characteristic (mixed-motive alternative).

*Id.*  "Whether summary judgment is appropriate depends on numerous factors, including 'the

strength of the plaintiff's prima facie case, the probative value of the proof that the employer's

explanation is false, and any other evidence that supports the employer's case and that properly

may be considered.'"  *Price v. Fed. Express Corp.*, 283 F.3d 715, 724 (5th Cir. 2002) (quoting

*Reeves*, 530 U.S. at 148–49).

i.    Pretext

If a plaintiff attempts to meet this ultimate burden under the pretext alternative to the

modified approach, she must "produce substantial evidence indicating that the proffered

legitimate nondiscriminatory reason is a pretext for discrimination."  *Willis v. Cleco Corp.*, 749

F.3d 314, 318 (5th Cir. 2014) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

"[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the

reason was false, *and* that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*,

509 U.S. 502, 515 (1993) (emphasis added).  "A plaintiff may establish pretext either through

evidence of disparate treatment or by showing that the employer's proffered explanation is false

or 'unworthy of credence.'"  *Id*. at 578 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212,

220 (5th Cir. 2001)).

Bassett has never identified a comparator, so she cannot prevail under the disparate-treatment approach. *See Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009) (requiring disparate treatment between similarly situated workers). She also sidesteps the false-or-unworthy-of-credence approach, faulting WLBT for claiming that she must show "the reason given was false or pretextual." Pl.'s Mem. [43] at 15. As she notes, she may prevail at this stage under the alternative mixed-motive approach, something she does address. *Id.* Absent any argument for pretext, the Court turns to mixed motive.[3]

ii.    Mixed Motive

Under the mixed-motive alternative, a plaintiff must offer direct or circumstantial evidence that race "was a motivating factor for any employment practice." *Desert Palace, Inc., v. Costa*, 539 U.S. 90, 99–101 (2003). Bassett offers no direct evidence, and her circumstantial case falls short.

***Undisputed facts.*** Before addressing the parties' mixed-motive arguments, it's helpful to recall what is undisputed. In a six-month period, Bassett twice made on-air comments that people viewed as racially offensive. First, her "grand mammy" comment generated complaints from co-workers and viewers. Pl.'s Mem. [43] at 4–5. Based on that, WLBT gave Bassett a written reprimand and termination warning. Notice [35-1] at 177.

---

[3] If Bassett's claim does not fit the mixed-motive approach, then she has essentially forfeited at the pretext stage. But even had she challenged on pretext grounds, the result would be the same. "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578. "The ultimate determination . . . is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Crawford*, 234 F.3d at 902. The evidence addressed next under mixed motives would not establish that the stated reason was false or unworthy of credence. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 n.2 (5th Cir. 2005) (recognizing that evidence was insufficient to establish a mixed motive "for the same reasons" it failed to establish pretext); *see also Mackey v. Enventives, L.L.C.*, 802 F. App'x 835, 838 (5th Cir. 2020) (same).

Second, after her Snoop Dogg quote, WLBT heard complaints from five Black employees who said the expression included "the 'N' word." Pl.'s Mem. [43] at 9. The concern was immediate; Bassett's co-anchor (a Black man) told her that day, "I can't believe you just said the N word on live TV." Bassett Dep. [39-2] at 78. And there is no dispute the station heard complaints from viewers. Pl.'s Mem. [43] at 7–8. In other words, Bassett did what WLBT said she did.

*Whether WLBT admitted discrimination.* According to Bassett, "the crucial, overriding fact" is "that Defendant's corporate representative admitted that the words which Bassett used would have been viewed differently if uttered by a black person." Pl.'s Mem. [43] at 13. She bases that on this quote from Fortenberry, one of two White WLBT executives said to have fired Bassett:

> Q. Do you mean by that that there's some things that black people can say that white people can't say?
>
> A. Absolutely.

*Id.* (quoting R. 30(b)(6) Dep. [35-4] at 16).

But the context of the answer matters. *Easterling v. Tensas Par. Sch. Bd.*, 682 F. App'x 318, 324 (5th Cir. 2017) (affirming summary judgment and rejecting plaintiff's construction of deposition testimony based on context). As WLBT notes, Bassett omits the next lines from that same deposition:

> Q. Okay. And so far as you know—I mean, I know you didn't even know what the phrase meant yourself at the time, but so far as you know now is it offensive or—is it something that black people can't say or is it just something that white people can't say?
>
> A. I think it depends on the circumstances and the situation. It's certainly not something you want to say on the air whether you're black or white, on our television station for sure.

R. 30(b)(6) Dep. [35-4] at 16:19–17:3 (emphasis added).  Moments later, Fortenberry rejected

Plaintiff's characterization of his first statement:

> Q.      It was your earlier testimony that there's some things that black people might be permitted to say, but white people would not be permitted to say that would be appropriate for blacks but not appropriate for whites; am I correct?
>
> . . .
>
> A.      I made the statement that it doesn't matter if they're white or black, on our television station there are things they can't say regardless of their race.

*Id.* at 19:7–17.  And he had already explained:  "I'm saying if you're a professional broadcaster

or journalist you should not say anything unless you know what it means."  *Id.* at 12–13.

Viewed in the light most favorable to Bassett, Fortenberry did agree there are things

Black people can say in society that White people can't.  But when asked specifically about

statements by his on-air professionals, he said neither may say them.  *Id.*  That testimony is

uncontradicted.

**Would WLBT have treated a Black anchor better.**  Aside from the Fortenberry quote,

Bassett believes a Black journalist would get away with using a variant of the "N word" on air.

Pl.'s Mem. [43] at 13.  She says that makes *Bostock v. Clayton County* controlling.  *Id.* (citing

590 U.S. 644 (2020)).

For starters, this case is not like *Bostock*.  There, the Supreme Court held that "[a]n

employer who fires an individual for being homosexual or transgender fires that person for traits

or actions it would not have questioned in members of a different sex."  *Bostock*, 590 U.S. at

651–52.  The facts in those consolidated appeals were simple:  "An employer fired a long-time

employee shortly after the employee revealed that he or she is homosexual or transgender—and

allegedly for no reason other than the employee's homosexuality or transgender status."  *Id.* at

653.  In other words, there was no dispute that the decisions were based on the employees'

protected characteristics. Unlike in *Bostock*, Bassett can only speculate that WLBT would have allowed a Black comparator to use the same language.

WLBT notes two district-court cases, one from this Court, rejecting similar arguments. *See* Def.'s Mem. [37] at 9 (citing *Anderson v. Off. Depot, Inc.*, No. 3:08-CV-288-DPJ-JCS, 2009 WL 1116306, at *1 (S.D. Miss. Apr. 24, 2009); *Martin v. El Nell Inc.*, No. 3:03-CV-2209, 2005 WL 2148651, at *1 (N.D. Tex. Sept. 7, 2005)). *Martin* is a tighter fit. There, a math instructor was fired for a comment heard by a Black administrator and a Black student—both of whom were offended. *Martin*, 2005 WL 2148651, at *1. Martin argued that the school found her statement offensive only because she was White—i.e., the comment would be okay if made by a Black person. *Id.* at *3. But the court rejected her argument as based on subjective belief rather than evidence. *Id*.

*Martin* is not binding, but this Court cited it in *Anderson*. 2009 WL 1116306, at *1. There, the plaintiff was fired for referring to a Black co-worker as "player." *Id.* The decisionmaker testified that when used by White people to address Black people, "it is right up there with calling a person 'boy,' or using the 'N' word" but that among Black people it has a different meaning. *Id.* at *2. Anderson argued that this testimony reflects "racial stereotyp[ing]" and was direct evidence of discrimination. *Id*. at *3. But the Court concluded that the evidence was not direct, in part because "such a finding would require the inference that Defendant would not terminate an African-American employee under substantially similar circumstances." *Id*. Since the plaintiff conceded that he couldn't make his prima facie case on circumstantial evidence, his case failed. *Id*. at *4.

Whatever one thinks of the words at issue in *Martin* and *Anderson*, Bassett's phrases are at least comparable to them. And Bassett's claim is less compelling because the only evidence

on this point comes from Fortenberry, who testified that "it doesn't matter if they're white or black, on our television station there are things they can't say regardless of their race." R. 30(b)(6) Dep. [35-4] at 19; *see also id.* at 17 (stating that Snoop Dogg quote was "certainly not something you want to say on the air whether you're black or white, on our television station for sure").

There is simply no evidence suggesting that a Black anchor would not have been disciplined for using (on air) a term people perceive to be the equivalent of the "N word," especially six months after generating complaints for using another term that offended viewers and coworkers.

Bassett is therefore left with her subjective belief that a Black anchor would have been treated better. But "an employee's subjective belief of discrimination, however genuine, cannot be the basis of judicial relief." *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 470 (5th Cir. 2021) (quoting *EEOC v. La. Off. of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995)); *see also Samaad v. City of Dallas*, 940 F.2d 925, 941 (5th Cir. 1991) (rejecting equal-protection argument that city "*would have* acted differently had a predominantly white neighborhood" been affected by its actions) (emphasis in *Samaad*), *abrogation on other grounds recognized by Tetra Techs., Inc. v. Cont'l Ins. Co.*, 755 F.3d 222, 230 (5th Cir. 2014).

**Whether the comments were offensive.** Bassett also challenges WLBT's conclusion that her conduct was offensive. She correctly notes that the station's White decisionmakers did not know the phrase could offend until they heard complaints, mostly from Black co-workers and viewers. Pl.'s Mem. [43] at 7–8. She also thinks the investigation was faulty because management never asked Snoop Dogg or Bassett what the term meant to them. *Id.* at 8.

14

None of that matters.  First, there is no dispute the managers heard complaints.  Second, "evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision.  Management does not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).

***Whether Bassett intended to offend.***  Nor can Bassett avoid summary judgment by arguing that she did not know her comments were offensive.  Bassett says she believed the Snoop Dogg phrase was benign, meaning: "[F]or real, my friend" or "for real, my brother." Bassett Dep. [39-2] at 78.  But the question is whether the decisionmakers were motivated by racial animus against her; her intent is irrelevant.

For example, in *Jones v. Lubbock County Hospital District*, the plaintiff was disciplined for violating a work rule against gossiping.  834 F. App'x 923, 927–28 (5th Cir. 2020).  Similar to Bassett, the plaintiff denied "that his conduct amounted to gossip," but the Fifth Circuit affirmed summary judgment, finding that this evidence "falls short of the substantial evidence required to prove pretext." *Id.* (citing *Laxton*, 333 F.3d at 579); *see also Spencer v. Publix Super Mkts., Inc.*, No. 1:17-CV-3777, 2018 WL 6720426, at *13 (N.D. Ga. Sept. 11, 2018), *report and recommendation adopted*, 2019 WL 2004136 (N.D. Ga. Mar. 21, 2019) (rejecting argument that plaintiff "did not intend to be dishonest, but simply made a mistake . . . by not clocking out" because it does not violate Title VII to fire an employee based on "mistaken but honest impression that the employee violated a work rule") (quoting *Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999)).

In short, Bassett offers "no evidence that [WLBT] did not reasonably believe [she] had committed these infractions." *Lockhart v. Republic Servs., Inc.*, No. 20-50474, 2021 WL 4955241, at *4 (5th Cir. Oct. 25, 2021) (affirming summary judgment); *see also Jackson v. Cal-W. Pkg. Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) ("[I]n cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith" (quotation marks omitted)).  Indeed, Bassett acknowledges the material facts upon which WLBT says it based the decision.  So even though Bassett never intended to offend, that does not create a triable mixed motive.

*Bassett's record.*  Bassett argues that terminating her employment after years of exemplary service demonstrates racial animus.  Pl.'s Mem. [43] at 18–19.  Bassett likens her case to *Kidd v. Mississippi Department of Human Services*.  *Id.* at 19 (citing No. 3:21-CV-234-DPJ-FKB, 2022 WL 17573423, at *1 (S.D. Miss. Dec. 9, 2022)).  In *Kidd*, this Court denied summary judgment and noted that "[b]y all accounts, Kidd was an excellent employee, consistently performed at a high level, and had an unblemished record."  *Id.*

Bassett did have a long and successful career at WLBT, but her record at the end was not "unblemished."  *Id.*  The "grand mammy" incident occurred in October 2022, resulting in discipline and a warning that her employment would be terminated if it happened again.  Notice [35-1] at 177.  The Snoop Dogg quote came less than six months later.  A reasonable jury could not infer racial animus from these facts.

*WLBT's support of Jackson State University.*  Bassett says WLBT "permits an inference of anti-white bias by operating a media training center where it trains almost exclusively black students to enter the news media business."  Pl.'s Mem. [43] at 18.  The program was part of the

Gray Media Training Center directed by Michael White. White Dep. [39-5] at 7. And according to him, the program was designed "to help HBCUs and students of color learn a little bit more about the industry and to . . . enhance diversity across our industry." *Id.* at 14–15.

These facts do not demonstrate discriminatory motive by the decisionmakers for two reasons. First, White gave unrebutted testimony that the training center is separate from the newsroom and that he was not consulted about the termination decision. *Id.* at 20–21. "[S]tatements of non[-]decision makers, or statements by decision makers unrelated to the decisional process itself [do not] suffice to satisfy the Plaintiff's burden' of showing discriminatory intent." *Lavigne v. Cajun Deep Founds., LLC*, 654 F. App'x 640, 647 (5th Cir. 2016) (quoting *Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001)) (alterations in original); *accord East v. Walgreen Co.*, 860 F. App'x 367, 369 (5th Cir. 2021). Bassett cites no evidence suggesting that the decisionmakers were influenced by the intern program.

Second, Bassett offers no authority that this outreach program offers proof of mixed motive as to her. The Court's own research found few relevant cases. In the direct-evidence context, the Fifth Circuit has required a nexus between affirmative-action programs and the disputed employment decision. *See Carter v. O'Neill*, 78 F. App'x 978, 979 (5th Cir. 2003) (affirming summary judgment). Another somewhat analogous example comes from the Northern District of Georgia, *Isvaradevan v. Fulton County,* No. 1:06-CV-2504, 2008 WL 11327336, at *10 (N.D. Ga. Aug. 26, 2008). That court granted summary judgment on a Title VII race claim because there was no proof the decisionmaker "applied her general belief about the benefits of affirmative action to her decision." *Id.* These cases are not perfect fits, but Bassett offers no authority suggesting that the intern program creates a fact question whether her decisionmakers were motivated by her race.

***Same-race decisionmakers.***  WLBT argues that "the two relevant decision-makers involved in Plaintiff's discharge were white."  Def.'s Mem. [37] at 13 (citing *Kelly v. Costco Wholesale Corp.,* 632 F. App'x 779, 783 (5th Cir. 2015)).  In *Kelly*, the Fifth Circuit noted that "membership in the same protected class as [Plaintiff] bolsters the inference that age discrimination was not the reason for [Plaintiff's] termination."  *Kelly*, 632 F. App'x at 783 (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (holding that "fact that the actor involved in both employment decisions is also a member of the protected class only enhances the [same-actor] inference")).

This issue is not dispositive.  As found in *Oncale v. Sundowner Offshore Services, Inc.*, people from the same protected class can still discriminate against each other based on that classification.  523 U.S. 75, 79 (1998) (considering employee of same sex as decisionmaker).  As the Court put it, "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex."  *Id.*  Thus, while there is no bar, *id.*, the Fifth Circuit has applied an inference at the final burden-shifting stage, *see Kelly*, 632 F. App'x at 783.

Bassett never addresses this legal issue, but the Court is reluctant to apply an inference because *Kelly* and *Brown* both considered this evidence under a pretext analysis, not mixed motive.  Perhaps it applies here too, but that issue has not been adequately briefed.  In any event, Bassett's record evidence fails to meet her burden.  So even without this inference, the claim would still fall short.  The argument is noted for the record.

***Bassett's prima facie case.***  The strength of the prima facie case remains a factor at this stage.  *Reeves*, 530 U.S. at 148–49.  Bassett's is weak.  As noted, her claim would likely fail at

the prima facie stage had the Court applied the work-rule-violation test. *Turner*, 675 F.3d at 892–93. Bassett was, however, replaced by someone outside her protected class.

That was enough to move forward, but, as WLBT notes, it first offered the position to a White replacement. Def.'s Mem. [37] at 13 (citing Jones Dep. [39-6] at 69–71). Bassett says the Court need not "take Defendant's word that this was a genuine offer," Pl.'s Mem. [43] at 19; but the testimony is undisputed, and speculation is irrelevant, *TIG Ins. Co.*, 276 F.3d at 759.

WLBT's attempt to replace Bassett with another White journalist diminishes the extent to which her prima facie case supports finding a racial motivation for the termination decision. *See Anderson v. Tupelo Reg'l Airport Auth.*, 967 F. Supp. 2d 1127, 1132 (N.D. Miss. 2013), *aff'd*, 568 F. App'x 287 (5th Cir. 2014), *as revised* (May 19, 2014) (finding "less than compelling evidence" of discrimination when job initially offered to person within protected class); *cf. Reynolds v. Sovran Acquisitions, L.P.*, No. 3:14-CV-1879-D, 2015 WL 6501552, at *8 (N.D. Tex. Oct. 27, 2015), *aff'd*, 650 F. App'x 178 (5th Cir. 2016) (holding under similar facts that "[t]his evidence would not permit a reasonable jury to find that Sovran's legitimate, nondiscriminatory reasons are pretextual").

To be sure, this fact is not dispositive. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 426–27 (5th Cir. 2000). But Bassett's prima facie case does not help her prove an improper motive. *Cf. Bright v. GB Bioscience Inc.*, 305 F. App'x 197, 203 (5th Cir. 2008) (affirming summary judgment because plaintiff failed to prove pretext "[w]ithin the context of a weak prima facie case"); *Hill v. Fort Bend Indep. Sch. Dist.*, 275 F.3d 42, 2001 WL 1223672, at *3 (5th Cir. 2001) (unpub.) (same). Again though, Bassett's evidence falls short under mixed-motive analysis.

In sum, Bassett has presented a weak prima facie case, has offered no comparators, and has not otherwise created a fact question whether race motivated the decision to end her employment. Under the circumstances, WLBT is entitled to summary judgment on her Title VII claim.

B.    Noncompetition Clause

Section eleven of Bassett's 2021 employment agreement with WLBT prohibited Bassett from working in the local radio or TV market for one year after "termination of employment, regardless of the reason for termination." Agr. [39-3] at 6. Bassett wants the Court to enter a declaratory judgment that the noncompetition provision is void under Mississippi law. Compl. [1] at 4; Pl.'s Mem. [43] at 22.

WLBT fired Bassett on March 14, 2023. Charge [35-1] at 179. So even if the provision was in effect when she filed suit, it has now expired. WLBT says that means the issue is moot and no longer presents an "actual controversy" under 28 U.S.C. § 2201(a), the Declaratory Judgment Act. Def.'s Mem. [37] at 15. It denies Bassett can show any prospect of future harm from the expired agreement. *Id.* (citing *City of Los Angeles v. Lyon*, 461 U.S. 95, 103 (1983)).

In response, Bassett fails to engage with this issue, seizing instead on WLBT's somewhat irrelevant comment that Bassett didn't seek injunctive relief at the start. Pl.'s Mem. [43] at 21; *see* Def.'s Mem. [37] at 15. That's beside the point as to mootness or standing, which Bassett never mentions.

"Mootness is 'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Envtl. Conserv'n Org. v. City of Dallas*, 529 F.3d 519, 524–25 (5th Cir. 2008) (quoting *Ctr. for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)). One

claim in a case may be moot while another is not. *La. Envtl. Action Network v. U.S. E.P.A.*, 382 F.3d 575, 581 (5th Cir. 2004).

The Court agrees with WLBT that the validity of the noncompetition clause is now moot. *See Markwardt v. United Rentals (N. Am.), Inc.*, No. SA-13-CA-627, 2014 WL 12540713, at *3 (W.D. Tex. Feb. 7, 2014) (reaching similar holding). Absent any argument to the contrary from Bassett, the Court grants summary judgment on this claim as well.

IV.     Conclusion

The Court has considered all arguments presented. Any not specifically addressed here would not change the outcome. The motion for summary judgment [35] is granted, and this civil action is dismissed with prejudice. A separate judgment will issue. Fed. R. Civ. P. 58.

**SO ORDERED AND ADJUDGED** this the 19th day of May, 2025.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE